STATE OF NORTH CAROLINA v. WARREN HARDIN JONES AND ALBERT JOYNER ALIAS THURMAN BOYKIN

No. 57

(Filed 14 July 1978)

1. **Searches and Seizures §§ 34, 37— shotgun in automobile—plain view—search incident to lawful arrest**
    In a prosecution for armed robbery defendants' contention that a shotgun was unconstitutionally seized from their automobile is without merit, since a patrolman's uncontradicted testimony established that the weapon was in plain view, the officer observing it in the floor of the car while he was standing on the curb, and it was seized pursuant to a lawful arrest, the officer having stopped defendants' car because it fit the description of a car involved in an armed robbery which the officer learned about over the radio.

2. **Searches and Seizures § 11— warrantless search of vehicle—probable cause**
    Where probable cause exists to search an automobile and circumstances warrant removing it for a search at some other location, such as the police station, the "exigent circumstances" requirement is satisfied and a warrantless search may be conducted within a reasonable time at the location to which the automobile is removed.

**3. Searches and Seizures § 11— warrantless search of vehicle at police station—probable cause**

The trial court properly concluded that probable cause existed to search defendants' automobile at the police station where it had been taken following defendants' arrest and that the search was neither unreasonable nor conducted in violation of defendants' constitutional rights where the car fit the description of one used in an armed robbery a few hours earlier; the officer who stopped the car saw a shotgun in plain view in the vehicle; the vehicle was removed to the police station and a warrantless search was conducted without consent having been given; the arrest and the search at the station took place on the same day, apparently while it was light, and were separated by a period of only a few hours; and the trial judge expressly found probable cause for the search.

**4. Arrest and Bail § 9— motion to reduce bail—denial no abuse of discretion**

Defendants' contention that the trial court erred in denying their motion for reduction of bail is without merit, since bail in the amount of $30,000 was not so excessive as to transgress the bounds of the trial court's discretion or to infringe upon defendants' constitutional rights; defendants were charged with armed robbery which carried a maximum penalty of life imprisonment; evidence against defendants included the testimony of two eyewitnesses and numerous items identified as fruits of the robbery found in their custody and control shortly after the crime; defendants stated their intention to obtain counsel at their own expense if released; one defendant had previous convictions for assault, breaking and entering, larceny and passing worthless checks; bail was twice reduced, which suggested that defendants' requests for reduced bail received fair consideration by the trial court; and defendants failed to show how they were prejudiced by the court's refusal to reduce their bail.

**5. Constitutional Law § 30— motion for discovery—abandonment of motion**

Defendants' contention that the trial court erred in failing to allow their motion for discovery made pursuant to G.S. 15A-903 is without merit since defendants waived their statutory right to have the trial court order the prosecutor to permit discovery by failing to argue or make any other showing in support of their discovery motion at a hearing on the motion; upon the judge's conclusion that the motion had been abandoned, defendants made no objection or attempt to be heard; the judge never ruled on the motion, and although five months elapsed between the hearing and trial, defendants never sought to obtain a ruling; even if the trial court had ordered the prosecutor to comply with defendants' discovery requests and he had failed to comply, defendants would not necessarily be entitled to a new trial since that is only one of the four different sanctions provided in G.S. 15A-910 and defendants never sought to invoke any of them; and defendants never suggested how any foreclosure of discovery might have operated to hinder their preparation or otherwise prejudice them at trial.

**6. Constitutional Law § 45— court-appointed counsel—motion to dismiss properly denied**

The trial court did not err in denying defendants' *pro se* motions to dismiss their court-appointed trial attorneys since the motions were made on the day the cases were called for trial; defendants stated that they wished to

employ their own counsel; defendants could not tell the court the names of the attorneys they intended to employ; and though defendants had already had six months in which to employ counsel, they had failed to do so, and the court had every right to suspect the bona fides of the defendants.

APPEAL by both defendants from *Martin (Perry), J.*, at the 17 January 1977 Session of EDGECOMBE Superior Court. Defendants were convicted of armed robbery and sentenced, respectively, to life imprisonment. Docketed and argued as No. 30 at the Fall Term 1977.

*Rufus L. Edmisten, Attorney General, by Archie W. Anders, Assistant Attorney General, for the State.*

*George A. Goodwyn, Attorney for Defendant Appellants.*

EXUM, Justice.

Defendants' assignments of error deserving discussion challenge (1) the admissibility of various items of evidence, on the ground that they were obtained through unconstitutional searches of an automobile in which defendants were apprehended; (2) the legality of their pre-trial confinement, on the ground that bail was unconstitutionally excessive; (3) the failure of the trial court to grant their pre-trial motion for discovery pursuant to G.S. 15A-902, *et seq.*; and (4) the failure of the trial court to allow their motion to dismiss their court-appointed attorneys. We find no merit in any of these assignments and no error in the trial.

The state's evidence tends to show that on 27 June 1976 Faye Medlin was working at J&J Quik Mart on Leggett Road in Edgecombe County. Just after she opened the store around 9:00 a.m., a man came in, purchased a pack of cigarettes, and then left. A few minutes later another man entered and bought cigarettes. Faye Medlin identified the two men at trial as defendant Jones and defendant Joyner (alias Thurman Boykin), respectively. Joyner was wearing sunglasses, a tan hat and a blue shirt. Mrs. Medlin turned around to get another carton of cigarettes and turned back to discover Joyner pointing a shotgun at her head. He told her it was a robbery and tied her hands behind her back as she lay face down on the floor. Her diamond ring and wedding band were then removed, and she heard the cash register emp-

tied and a money bag taken from under the counter. Altogether $550 in cash and about $675 in checks and food stamps were taken.

About this time James Suggs arrived at the J&J Quik Mart. He saw in the "store yard" a 1968 dark green Plymouth with the hood "a different color from the rest of the car," a dent in the fender, and a white chrome strip down the side. As he entered the store, James Suggs saw Faye Medlin lying on the floor and Jones standing over her. Then Joyner, standing behind the door and holding a sawed-off shotgun, told him to "Hit the floor." He did so, whereupon defendants tied his hands with some cord, told him not to move, and left. Shortly thereafter another customer arrived and untied Faye Medlin and James Suggs. They immediately summoned the police.

Around 9:20 a.m. the same morning police observed a 1968 dark green Plymouth with a discolored hood, dented fender and white chrome strips, North Carolina license JWL 135, traveling south on Main Street in Tarboro. Having been alerted that a vehicle of this description was used in a robbery in Edgecombe County, they stopped the car and found it occupied by defendants. Patrolman Jimmy Lewis approached the passenger side, where Joyner was seated, and observed a shotgun protruding from beneath the seat. Lewis seized the shotgun, which proved to be a sawed-off gun. Jones and Joyner were then placed under arrest. They and the Plymouth automobile were taken by investigating policemen to the Tarboro Police Station. There a roll of money wrapped in rubber bands, amounting to $550, was taken from Joyner's left front pocket. A search of the vehicle at the station resulted in the discovery and seizure of a woman's pair of gloves, diamond ring, wedding band, sunglasses, tan hat, blue shirt, and twenty-four cartons of cigarettes.

Defendants offered evidence in an attempt to impeach the testimony of Faye Medlin and James Suggs on the basis of variances in their testimony at an earlier probable cause hearing, and tending to show that the Plymouth owned by defendant Jones did not have a chrome strip down the side. Ada Lee Boykin testified that Joyner regularly carried over $500 folded in his pocket before 27 June 1976.

Defendant Jones testified, denying any involvement in the robbery and any knowledge of the location of J&J Quik Mart. He

stated that on 27 June 1976 he and Joyner traveled from Wilson to visit Ralph Nettles, who lives near Tarboro. Nettles was not at home, so they proceeded to Princeville to see Wilbur Staton. Upon learning that Staton had moved to Washington, D. C., they left to visit some friends in East Tarboro and were traveling through Tarboro on Main Street when the police stopped them shortly after 9:20 a.m. They were told they were suspected of possessing marijuana, shoved repeatedly, and informed that they "didn't have any rights down here." Joyner did not testify.

I

Defendants first contend the trial court erred in admitting the sawed-off shotgun and other items of evidence taken from defendants' automobile because these items were unconstitutionally seized.

No voir dire examination was held concerning the shotgun seized at the time of defendants' arrest. Tarboro patrolman Jimmy Lewis testified before the jury:

"I walked right up to the door of the car, the right-hand side. I observed [defendant Joyner] sitting in the seat by the door with his hand palms' down between his legs and I didn't know whether he had his hands clinched — I couldn't tell whether he had his hands clinched or not but they were between his legs, palms down. I asked him to put his hands up on the dash so that I could see them and to see if anything was in them. He put his hands up in this manner on the dash. At that time after he pulled his hands out from between his legs and put them up like that there was a space between his hands and his legs. At that location the curb is fairly high and I was looking directly down between his legs and sticking out from under the seat of the car was a shotgun, what appeared to be a shotgun. When I looked into the floorboard of the car I saw part of the stock of a shotgun and the hammer area of the shotgun. The trigger part was up under the seat. At that time I opened the door and took [defendant Joyner] by his right hand and told him he was under arrest for carrying a concealed weapon. . . . I reached in and took the shotgun out of the car and held it up in this manner."

Following this testimony the state offered the shotgun into evidence. Defendants at that point objected, and the shotgun was received in evidence over the objection.

Upon defendants' motion to suppress "any further evidence concerning the automobile and the search," the trial judge held a voir dire examination. Only the state offered evidence. Sergeant Russell Armstrong of the Tarboro Police Department testified he and Patrolman Jimmy Lewis were on patrol in the morning of 27 June 1976. He had information that two black males, armed with a sawed-off shotgun and riding in a 1968 or 1969 dark colored Plymouth with a white chrome side strip, had perpetrated an armed robbery. As a result of a radio report he and Lewis went to St. John Street in Tarboro near the post office. They found that policemen Knox and Sherman had stopped a green 1968 Plymouth. Two black males were observed at the scene. Jones was standing at the left side of the Plymouth. Joyner was sitting in the right front passenger seat. Sergeant Armstrong asked to search the car and Jones refused to give consent. He nevertheless proceeded to search the car. He opened the trunk and then observed Patrolman Lewis holding up the sawed-off shotgun. Sergeant Armstrong then placed Jones under arrest for armed robbery. Both defendants and the automobile were taken by the officers to the Tarboro Police Station.

On further voir dire Edgecombe County Deputy Sheriff Marion Proctor testifed that he investigated the robbery at J&J Quik Mart. His investigation revealed that the perpetrators were two black males who were operating a dark green 1967 or 1968 Plymouth with a dent on one side, a "rusty colored or primer brown" hood and a white side strip, and who were armed with a sawed-off shotgun. He then received information from the Tarboro police that they had stopped two black males riding in a 1967 or 1968 green Plymouth and that one of the men had a sawed-off shotgun. He learned also that the men and the automobile were at the Tarboro Police Station. Upon arriving at the police station he observed the Plymouth automobile, which fitted precisely the description he had been given. Deputy Proctor then got the keys to the automobile and searched it, finding the items delineated above.

The trial court found facts in accord with the state's evidence, concluded that probable cause existed to search the

automobile at the police station and that the search was neither unreasonable nor conducted in violation of defendants' constitutional rights, and consequently denied defendants' motion to suppress.

[1] Defendants' contention that the shotgun was unconstitutionally seized is totally without merit. Patrolman Lewis' uncontradicted testimony establishes that the weapon was in plain view, *Harris v. United States*, 390 U.S. 234 (1968); *State v. Legette*, 292 N.C. 44, 231 S.E. 2d 896 (1977); *State v. Smith*, 289 N.C. 143, 221 S.E. 2d 247 (1976), and it was seized pursuant to a lawful arrest, *United States v. Robinson*, 414 U.S. 218 (1973); *State v. Harrington*, 283 N.C. 527, 196 S.E. 2d 742 (1973); *State v. Dobbins*, 277 N.C. 484, 178 S.E. 2d 449 (1971).

Turning now to the admissibility of the other items obtained from defendants' vehicle after it was removed to the police station, we begin with the rule stated in *State v. Legette, supra,* and *State v. Allen*, 282 N.C. 503, 512, 194 S.E. 2d 9, 16 (1973): "[A] warrantless search of a vehicle capable of movement may be made by officers when they have probable cause to search and exigent circumstances make it impracticable to secure a search warrant." In *Allen* this Court found no error in the admission into evidence of burglary tools discovered when police arrested the defendants around 2:30 a.m., removed their automobile to the police station, and shortly thereafter conducted a warrantless search that produced the tools. Justice Branch, writing for the Court, observed, 282 N.C. at 512-13, 194 S.E. 2d at 16, "The search yielding the burglary tools cannot be justified as a search incident to defendants' arrest since the search was made *after* defendants were under arrest and in custody at the police station. . . . Nor were the burglary tools in plain view so as to preclude the necessity of a search. Thus, if the search was reasonable, it must be because there was probable cause to search under such exigent circumstances as to make it impracticable to obtain a search warrant." (Emphasis original.) He then proceeded to discuss the leading cases of *Coolidge v. New Hampshire*, 403 U.S. 443 (1971); *Chambers v. Maroney*, 399 U.S. 42 (1970); and *Carroll v. United States*, 267 U.S. 132 (1925), in which the Supreme Court has sought to define the circumstances justifying a warrantless search of an impounded or immobilized vehicle. No purpose would be served by repeating here Justice Branch's careful discussion of

each of these cases. It seems appropriate, however, to add *Texas v. White*, 423 U.S. 67 (1975), and *Cardwell v. Lewis*, 417 U.S. 583 (1974), to the list of leading decisions which, as noted by Mr. Justice Rehnquist in *Cady v. Dombrowski*, 413 U.S. 433, 440 (1973), "suggest that this branch of the law is something less than a seamless web." *See generally* Comment, Warrantless Searches and Seizures of Automobiles and the Supreme Court from *Carroll* to *Cardwell*: Inconsistently Through the Seamless Web, 53 N.C.L. Rev. 722 (1975).

In *Cardwell v. Lewis, supra,* a murder case reaching the Supreme Court via federal habeas corpus, the defendant was summoned to appear at the police station on a certain day and, complying voluntarily, he arrived shortly after 10:00 a.m. The police had obtained a warrant for his arrest and served him with it around 5:00 p.m. that afternoon, whereupon his car was removed from a public lot to the police impoundment lot. The next day the car was subjected to a warrantless "examination" by an investigator, who found the tread of one tire to match an impression made at the scene of the crime. The investigator also took paint samples and subsequently testified that in his opinion the samples were not different from foreign paint scrapings removed from the victim's automobile. Four justices found no constitutional error in the admission of this evidence against the defendant. Mr. Justice Blackmun's opinion, joined by Chief Justice Burger and Justices White and Rehnquist, declared that the exterior examination violated no privacy interest and thus was not a "search" requiring the interposition of a warrant. Justice Blackmun also emphasized the distinction between homes and offices, on one hand, and movable vehicles, on the other, that has resulted in less stringent warrant requirements for vehicle searches, and the exigent circumstances justifying the initial seizure of the defendant's car. Mr. Justice Powell concurred in the result for reasons related to the scope of federal collateral review of Fourth Amendment claims. 417 U.S. at 596; *cf. Stone v. Powell*, 428 U.S. 465 (1976).

In *Texas v. White, supra,* police were informed that a man was attempting to pass fraudulent checks at the drive-in window of a bank. They arrived around 1:30 p.m. and directed the defendant to park his automobile at the curb. A bank employee and one of the officers observed the defendant "attempting to 'stuff'

something between the seats." The police then arrested him, and one officer drove him to the station house while the other drove his car there. The defendant was questioned briefly at the station, and he refused to consent to a search of the automobile. The police nevertheless proceeded to search, without a warrant, and discovered checks which were subsequently admitted against the defendant at trial. In a per curiam opinion the Supreme Court found no constitutional violation in the search of the defendant's vehicle. The Court relied on *Chambers v. Maroney, supra,* 399 U.S. 42 (1970), for the proposition that "police officers with probable cause to search an automobile on the scene where it was stopped could constitutionally do so later at the station house without first obtaining a warrant." 423 U.S. at 68.

[2,3]    This Court, following the decisions, as we understand them, of the United States Supreme Court, has continued to insist on the requirement of "exigent circumstances" to justify a warrantless search of an automobile. *State v. Legette, supra; State v. Allen, supra.* The United States Supreme Court has indicated that the inherent mobility common to all automobiles is of "no constitutional significance." *Coolidge v. New Hampshire, surpa,* 403 U.S. 443, 461 n. 18 (1971) (plurality opinion of Justice Stewart, joined by Justices Douglas, Brennan and Marshall). In *Coolidge,* however, the police had entered the defendant's property and towed his automobile from his driveway, where it was parked, to the station house, where the search was conducted. The plurality opinion found *Chambers* not controlling and concluded that the seizure and subsequent search was unconstitutional, stating, 403 U.S. at 463 n. 20: "[I]t seems abundantly clear that there is a significant constitutional difference between stopping, seizing, and searching a car on the open highway, and entering private property to seize and search an unoccupied, parked vehicle not then being used for any illegal purpose." In *Cardwell v. Lewis, supra,* the defendant's car was seized from a public lot near the police station while the police had custody of the defendant and the car keys. In both *Coolidge* and *Cardwell* the justices who found the seizure of the automobile unconstitutional were less than a majority of the Court. In *Chambers* and *White,* on the other hand, the automobile was being operated on or near public roadways immediately prior to the arrest and seizure. Six and seven justices, respectively, found no constitutional error in the

seizure and removal of the automobile to the police station. We think *Chambers* and *White* mean that where an automobile is stopped on or near[1] a public street or highway and there is probable cause to search at the scene, this may constitute "exigent circumstances" permitting police to impound the automobile. We understand *White* to hold, moreover, that where probable cause exists to search an automobile and circumstances warrant removing it for a search at some other location, such as the police station, the "exigent circumstances" requirement is satisfied and a warrantless search may be conducted within a reasonable time at the location to which the automobile is removed. *White* is indistinguishable from the case now before us. There, as here, probable cause for the arrest was clearly present; the vehicle was removed to the police station and a warrantless search conducted without consent having been given; the arrest and the search at the station took place on the same day, apparently while it was light, and were separated by a period of only a few hours; and the trial judge expressly found probable cause for the search.

On the facts of this case, therefore, we find no constitutional error in the seizure of the defendants' automobile or the search which disclosed the rings and other items subsequently admitted at trial. This assignment of error is overruled.

II

[4] Defendants next contend the trial court erred in denying their motion for reduction of bail. Defendants do not contend that our statutes on pre-trial release, G.S. 15A-531, *et seq.*, were violated. Defendants seem to contend that their pre-trial appearance bonds were so unreasonably high as to violate our constitutional prohibition against "excessive bail." N.C. Const., Art. I, § 27.

The record discloses that defendants were arrested on 27 June 1976. The next day their release was authorized upon execution by each of them of an appearance bond in the amount of $100,000. Failing to post this amount they were held until 15 July 1976, when bail for each defendant was reduced to $50,000. On 28

---

1. "The fact that the car in *Chambers* was seized after being stopped on a highway, whereas Lewis' car was seized from a public parking lot, has little, if any, legal significance. The same arguments and considerations of exigency, immobilization on the spot, and posting a guard obtain." *Cardwell v. Lewis, supra,* 417 U.S. at 594-95 (plurality opinion by Justice Blackmun).

July defendants moved for further reduction of bail on the grounds that $50,000 was in excess of the amount necessary to assure their appearance and that confinement hindered their defense preparation. Judge George M. Fountain heard and denied their motions on 5 August. The next day defendants filed application for writ of habeas corpus, seeking primarily a determination whether $50,000 bail was unreasonable and excessive. The matter was heard on 23 August by Judge Albert W. Cowper, who reduced bail to $30,000. On 9 December 1976 defendants filed another motion for reduction of bail. This motion was denied the same day by Judge Fountain.

The primary purpose of an appearance bond is to insure the defendant's presence at trial. *Stack v. Boyle*, 342 U.S. 1 (1951); *State v. McCloud*, 276 N.C. 518, 173 S.E. 2d 753 (1970). General Statute 15A-534 authorizes the requirement of an appearance bond in lieu of outright unsecured release if such release "will not reasonably assure the appearance of the defendant as required; will pose a danger of injury to any person; or is likely to result in destruction of evidence, subornation of perjury, or intimidation of potential witnesses." Defendants do not contend they were entitled to an unsecured pre-trial release. They quarrel only with the *amount* of bail.

The amount of bail pending trial is a matter within the trial judge's discretion. *Forest v. United States*, 203 F. 2d 83 (8th Cir. 1953); *People ex rel. Klein v. Krueger*, 25 N.Y. 2d 497, 255 N.E. 2d 552 (1969); *see* 8 Am. Jur. 2d Bail and Recognizance §§ 68-69 (1963), and cases therein cited; *compare In re Reddy*, 16 N.C. App. 520, 525, 192 S.E. 2d 621, 625 (1972), and cases therein cited.

While bail in the amount of $30,000 seems somewhat high relative to amounts usually set in similar circumstances, *see State v. McCloud, supra*, it was not so excessive as to transgress the bounds of the trial court's discretion or to infringe defendants' constitutional rights. Defendants were charged with armed robbery in violation of General Statute 14-87, which at the time provided for "imprisonment for not less than five years nor more than life imprisonment in the State's prison" upon conviction. Evidence against defendants included the testimony of two eyewitnesses and numerous items identified as fruits of the robbery found in their custody or control shortly after the crime. While defendants alleged that they and their families are "persons of

very modest means," they also stated their intention to "obtain expert assistance at our own expense" if released. Defendant Jones had previous convictions for assault, breaking and entering, larceny and passing worthless checks. We note further that the amount of bail was twice reduced, from $100,000 to $50,000 and finally to $30,000, which suggests that defendants' requests for reduced bail received fair consideration by the trial court and were not met with arbitrary denials.

Even if we assume arguendo that $30,000 bail was excessive, defendants must show they were thereby prejudiced in order to prevail on appeal. *State v. Brunson*, 287 N.C. 436, 215 S.E. 2d 94 (1975); *State v. Paige*, 272 N.C. 417, 158 S.E. 2d 522 (1968). Such prejudice must appear of record. *State v. Duncan*, 270 N.C. 241, 154 S.E. 2d 53 (1967). A claim that excessive bail prejudiced the efforts of the accused to prepare for trial will not be sustained on mere "unsupported and conclusory allegations." *McCabe v. North Carolina*, 314 F. Supp. 917 (M.D.N.C. 1970). Here the record reveals in support of defendants' contention only allegations that the "bail bond requirement . . . does not allow us to properly prepare our defense unhampered by confinement" and that defendants' "preparation for trial is seriously hampered and hindered." It does not appear what evidence, if any, was offered in support of these allegations. On the other hand, Judge Fountain expressly found in his order of 3 November 1976 that "the court is informed by [defendants'] attorneys that they have had every opportunity necessary to confer with and advise their clients and secure all information that can be furnished by their clients."

We hold, consequently, that no prejudicial error appears in the trial court's denial of defendants' motion for reduction of bail below $30,000.

### III

By their third assignment of error defendants contend the trial court erred in failing to allow their motion for discovery made pursuant to G.S. 15A-903 or to order that counsel be permitted "to interview the witnesses named in the request presented."

The record discloses a letter dated 25 August 1976 from defendants to Assistant District Attorney Frank R. Brown. Rely-

ing on G.S. 15A-902,[2] defendants sought voluntary compliance by the prosecution with certain discovery requests. On 31 August 1976 defendants, relying on G.S. 15A-903, filed a motion with the court seeking an order requiring Mr. Brown to produce or permit them to inspect various items referred to in the statute. The motion declared that Mr. Brown had "indicated" he would not comply voluntarily with the requests made in their letter. Neither the letter nor the motion contained any  mention of a request by defendants to interview witnesses. This motion, along with several other defense motions, came before Judge Cowper on 9 September 1976. The order entered by Judge Cowper states: "As to the motion for discovery, the court heard no evidence with respect to this and assumes that this motion has been abandoned."

While G.S. 15A-903 *requires* the trial judge on proper motion to order the prosecutor to permit certain kinds of discovery,[3] "generally, in order for an appellant to assert a constitutional or statutory right in the appellate courts, the right must have been asserted and the issue raised before the trial court. Further, it must affirmatively appear on the record that the issue was passed upon by the trial court." *State v. Young*, 291 N.C. 562, 567, 231 S.E. 2d 577, 580 (1977); *State v. Parks*, 290 N.C. 748, 752, 228 S.E. 2d 248, 250 (1976). In *Young* the defendant assigned as error the failure of the trial court to hold a hearing to determine his capacity to proceed with trial, as required by G.S. 15A-1002(b)(3). As there was no evidence that the defendant or his attorney ever demanded such a hearing or objected to the failure of the trial judge to hold one, and no indication that the question was passed upon by the trial judge, we held, 291 N.C. at 568, 231 S.E. 2d at

---

2. The pertinent provisions of the statute are:

"§ 15A-902. *Discovery procedure.* —(a) A party seeking discovery under this Article must, before filing any motion before a judge, request in writing that the other party comply voluntarily with the discovery request. Upon receiving a negative or unsatisfactory response, or upon the passage of seven days following the receipt of the request without response, the party requesting discovery may file a motion for discovery under the provisions of this Article concerning any matter as to which voluntary discovery was not made pursuant to request.

(b) To the extent that discovery authorized in this Article is voluntarily made in response to a request, the discovery is deemed to have been made under an order of the court for the purposes of this Article.

(c) A motion for discovery under this Article must be heard before a superior court judge."

3. The statute says repeatedly that "[u]pon motion of a defendant, the court *must* order the prosecutor . . . ." G.S. 15A-903(a),(b),(c),(d), and (e). (Emphasis supplied.)

581, that "defendant's statutory right . . . was waived by his failure to assert that right. His conduct was inconsistent with a purpose to insist upon a hearing to determine his capacity to proceed."

In *State v. Cross*, 293 N.C. 296, 237 S.E. 2d 734 (1977), the defendant's attorney discovered upon cross-examination of a state's witness that the witness had been shown certain photographs prior to trial and had not been able to identify the defendant. Rejecting the defendant's contention that the trial court erred prejudicially in not requiring the state to produce the photographs, we said, 293 N.C. at 304, 237 S.E. 2d at 740: "When defendant learned of the pictorial lineup, he did not object, move for a mistrial, or in any manner bring this to the attention of the trial judge. . . . The record does not indicate that the photographs should or could have been provided to defendant since they were never requested. Under these circumstances, defendant has failed to show any prejudicial error on the part of the trial judge."

[5] In the present case we are satisfied defendants waived their statutory right to have the trial court order the prosecutor to permit discovery. It appears defendants did not argue or make any other showing in support of their discovery motion at the hearing before Judge Cowper. Upon his conclusion that the motion had been abandoned, the record discloses no objection or attempt to be heard on the part of defendants. Judge Cowper, moreover, never ruled on the motion. Although some five months elapsed between the hearing and trial, defendants never sought to obtain a ruling. Consequently, they cannot now be heard to complain of prejudicial error in Judge Cowper's failure to rule.

Even if the trial court had ordered the district attorney to comply with defendants' discovery requests and he had failed to comply, defendants would not necessarily be entitled to a new trial. The sanctions for such a failure are provided in G.S. 15A-910 as follows:

> "*Regulation of discovery — failure to comply.* — If at any time during the course of the proceedings the court determines that a party has failed to comply with this Article or with an order issued pursuant to this Article, the court in addition to exercising its contempt powers may

(1) Order the party to permit the discovery or inspection, or

(2) Grant a continuance or recess, or

(3) Prohibit the party from introducing evidence not disclosed, or

(4) Enter other appropriate orders. (1973, c. 1286, s. 1; 1975, c. 166, s. 17.)"

Imposition of these sanctions is within the discretion of the trial court. *State v. Braxton*, 294 N.C. 446, 242 S.E. 2d 769 (1978); *State v. Thomas*, 291 N.C. 687, 231 S.E. 2d 585 (1977). Defendants here never sought to invoke them.

Finally, defendants have not suggested how any foreclosure of discovery might have operated to hinder their preparation for or otherwise to prejudice them at trial. They do not specify any items of evidence which surprised them or which they could have excluded or rebutted more effectively had they been able to discover such evidence prior to trial.

Defendants' third assignment of error is therefore overruled.

IV

[6]   Finally, defendants contend the trial court erred in denying their *pro se* motions to dismiss their court-appointed trial attorneys. Defendants were arrested on 27 June 1976. On 23 July 1976 Mr. H. Vinson Bridgers was appointed to represent Jones and Mr. George M. Britt was appointed to represent Joyner. Mr. Bridgers and Mr. Britt acted in the capacity of court-appointed counsel from the date of their appointments until the completion of the trial. After trial the court appointed Mr. George A. Goodwyn to represent defendants on this appeal.

When these cases were called for trial and before the selection of the jury, the trial court conducted a brief hearing at the request of defendants in the absence of the jury panel. Each defendant moved *pro se* to have his court-appointed counsel "dismissed from the case." The reason given by each defendant was that he wanted to employ his own counsel. Upon inquiry of the court Jones admitted that he had not been able to employ counsel during the approximately six months between his arrest

and the impending trial but that money for that purpose was "being raised." Mr. Joyner when asked if he had employed an attorney replied, "One is in progress of coming in on the case. He is from out of state." Joyner, however, could not advise the trial court of the name or address of this attorney. He could only say that the attorney was from Baltimore. He said his "people" had money to employ counsel but that they were not in court because he had "told them not to come." Whereupon the trial judge stated for the record that he had been well acquainted with both Mr. Britt and Mr. Bridgers for over twenty years and knew both of them to be able, experienced trial lawyers. He denied each defendant's motion to dismiss his trial counsel, to which ruling each defendant excepted and now assigns as error on appeal.

There was no error in the trial court's denial of these motions. It is clear these defendants did not wish to represent themselves. They wanted, apparently, to dismiss their court-appointed counsel on the ground that they were or might be in a position to employ counsel of their own choosing. Since defendants had already had approximately six months to employ such counsel if they wished and were able to do so, the trial judge, as we said in *State v. Sweezy*, 291 N.C. 366, 373, 230 S.E. 2d 524, 529 (1976), had "every right to suspect the bona fides of the defendant[s]." We have held that a defendant's *pro se* motion to dismiss his court-appointed attorney was properly denied when it was made on the day trial was to begin and on the ground, among others, that defendant wished to employ his own counsel. *State v. Gray*, 292 N.C. 270, 281-82, 233 S.E. 2d 905, 913 (1977). We said then:

> "Defendant's assertion that he wished to employ his own counsel, made as it was, on the day trial was to begin and without the appearance or even the name of a single attorney who might be privately employed to represent him, was no ground for the dismissal of his court-appointed counsel. Defendant did not claim he had the funds to employ counsel. There is not a scintilla of evidence indicating defendant's intention or desire to represent himself . . . .
>
> "While defendant may have been peeved with his attorney for personal reasons, the court had no reason to doubt that attorney's effectiveness and capability as an advocate or

to suspect the relationship between defendant and his counsel to have deteriorated so as to prejudice the presentation of his defense. . . . To have allowed the motions to remove counsel would have significantly delayed defendant's trial without the slightest demonstration of any potential benefit to his case."

Precisely the same considerations obtain in the instant case. This assignment of error is overruled.

No purpose would be served by discussions of the remaining assignments of error presented in defendants' brief. We have examined them all and find them to be without merit.

No error.